1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| 7  D.S. by and through her next friend TARA URS; D.Y. by and through his next friend JULIE KELLOGG-MORTENSEN; H.A. by and through his next friend KRISTEN BISHOPP; and DISABILITY RIGHTS WASHINGTON, a nonprofit membership organization for the federally mandated Protection and Advocacy Systems,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES; and ROSS HUNTER, in his official capacity as Secretary of the Washington State Department of Children, Youth, and Families,<br><br>Defendants. | NO.  2:21-cv-000113<br><br><br><br>CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## I.    OVERVIEW

1.      Named Plaintiffs D.Y., D.S., and H.A.,[1] by and through their next friends and

acting on behalf of a class of children with behavioral health and developmental disabilities who

are in the custody of Washington State's child welfare system, and the non-profit organization,

Disability Rights Washington ("DRW") (collectively, "Plaintiffs"), bring this civil rights action

---

[1] Plaintiffs will seek permission to use pseudonymous initials for the minor Named Plaintiffs.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

against the Washington State Department of Children, Youth, and Families ("DCYF") and its Secretary ("Defendants").

2.  Children have a fundamental right to grow up in the care of their own families, absent imminent safety risks that cannot otherwise be resolved with appropriate supports.  The mission and objective of Washington State's child welfare program is to help preserve and reunify families in a safe manner.  When the state does remove children from their homes, it owes them a duty of care to provide for their health, safety and well-being.  However, across the state, foster children with behavioral health and developmental disabilities are separated from their families because of Defendants' failure to correct systemic deficiencies and maintain a system that ensures the provision of the services and supports they need to remain or reunify with their families.  Compounding the trauma associated with this separation, these children are enduring extreme and dehumanizing placement instability that has them cycling between temporary shelters, group homes, out-of-state facilities, one-night foster care stays, hotel stays, and government offices.  Far from ensuring children and families experience support and healing, DCYF's practices are re-traumatizing children, destroying their ability to bond with and trust adults, interrupting delivery of mental health care, disrupting educational attainment, and extinguishing any hope that children and their families will have the long-term stability they need and deserve.

3.  Named Plaintiffs D.Y., D.S., and H.A. and hundreds of other similarly-situated foster children with behavioral health and developmental disabilities have been deprived of the services and supports they need for family reunification or another permanent placement.  While removed from their families and communities, they have endured multiple days, weeks, or months when they were denied an actual placement altogether.  Instead, DCYF shuttled them

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

between motels, one-night foster care stays, and DCYF offices.  This practice, known as "exceptional placements" or one-night stays, results from DCYF's lack of a system to ensure stable placements in safe and supportive home environments, preferably with family. Defendants' actions have deprived Named Plaintiffs and many other children with disabilities of relationships with their families, while essentially rendering them homeless for extended periods of time.

4.     All too often the only alternative offered to Named Plaintiffs and other similarly situated children has been placement in a congregate care facility, where they are segregated with other youth who have behavioral health and developmental disabilities.  These congregate care programs provide what is called "Behavioral Rehabilitation Services" (BRS).  They are not permanent placements and are often located far away from children's families and home communities.  If there are no available BRS programs, DCYF has placed some foster children in out-of-state institutions located hundreds if not thousands of miles away.  Despite knowledge of the severe harm to children associated with a lack of lasting nurturing relationships and extreme placement instability, Defendants have neglected to address their failure to support children with disabilities in being raised and nurtured by their own families.  Defendants have also failed to address their rapidly growing pattern and practice of using hotels, one-night stays, and offices to warehouse children in their custody, most of whom have behavioral health and developmental disabilities.

5.     First, Defendants have failed to correct systemic deficiencies and maintain a system to ensure children with disabilities have the necessary child welfare services and supports to allow them to return promptly and safely to their own families and communities.  For example, by denying children visitation with parents and siblings and case plans that address the

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 3

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

1    services and supports needed for reunification, DCYF is failing to nurture the family unit, which

2    should remain intact unless there is a direct threat to the child's "basic nurture, physical and

3    mental health, and safety."  WASH. REV. CODE § 13.34.020 (1998).  Instead, DCYF engages in

4    practices that deprive children of reasonable opportunities to form, repair, or maintain bonds

5    with their families, which makes reunification more difficult, less likely, and painfully delayed.

6    Where reunification is not possible, DCYF is failing to provide stable and reliable supports

7    necessary to address the trauma that children who have lost their families suffer.  Defendants'

8    failure is robbing children of the long-term, reliable connections that are essential for them to

9    grow into healthy adults.

10          6.     Second, Defendants have failed to develop an adequate array of placement

11   options to support the individualized needs of children in foster care with disabilities and provide

12   them with a pathway to safely return home.  When children must be separated from their

13   families, each child in DCYF's custody is entitled to a "safe, stable, and permanent home and a

14   speedy resolution" of their case.  *Id.*  But Defendants' reliance on a patchwork of hotels, one-

15   night stays, and government offices has instead become the default system for warehousing

16   children with disabilities.  Defendants are failing to recruit, license, train, and support an

17   adequate number of intensive foster care placements to address the individualized needs of

18   children with disabilities and failing to hire, train, and support sufficient staff and service

19   providers with appropriate expertise to support these placements.

20          7.     Defendants' shadow foster care system comes with grave societal, economic,

21   human, and moral costs.  For example, because of Defendants' systemic failures, Plaintiff H.A.

22   spent three years cycling through abusive out-of-state institutions, only to end up living in a

23   DCYF office for several months before being placed in yet another temporary congregate care

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

1  facility.  Today, he is no closer to being reunified with his family than when he was first shipped

2  away to a pricey out-of-state residential care facility.  In addition to the staggering economic

3  costs associated with prolonged institutionalization and hotel usage, Defendants' systemic

4  failures are exacting a harrowing toll on children and families.

5         8.     Because the very system designated to protect and heal children instead causes

6  them harm and exacerbates their trauma, growing up in "the system" is all too often the fate of

7  foster children with behavioral health and developmental disabilities.  Rather than providing

8  them the supports they need to be loved and cared for by their own families—a need that every

9  child has—Defendants have turned to restrictive, isolating, and inhumane practices that unfairly

10  punish children for exhibiting behaviors that bear the signs of their accumulating trauma and

11  disabilities.  This vicious cycle must come to an end.  As one Washington foster child explained

12  in an interview about his experience being placed in an out-of-state institution, "It's not easy

13  being a foster kid.  You don't know anyone's story.  So don't judge them by how they may act

14  or how they may look because they could have something really bad going on in their life."

15  Susannah Frame, *Report finds prison-like conditions for Washington foster kids sent out of state*,

16  KING 5 NEWS (Oct. 18, 2018, 11:14 PM PDT), https://www.king5.com/article/news/local/report-

17  finds-prison-like-conditions-for-washington-foster-kids-sent-out-of-state/281-605444408.

18         9.     Defendants' failures violate the rights of disabled foster children under the United

19  States Constitution, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

20  *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et*

21  *seq.*, and the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C.

22  §§ 621 *et seq.*, 670 *et seq.*  To redress these ongoing violations, Plaintiffs seek declaratory and

23  injunctive relief on behalf of themselves, DRW's constituents, and the putative Class.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (4), which confer on the federal district courts original jurisdiction over all claims asserted pursuant to 42 U.S.C. § 1983 to redress deprivations of rights, privileges, or immunities guaranteed by Acts of Congress and the United States Constitution.  Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Western District of Washington and Defendants may be found here.

## III.      PARTIES

12.     ***Plaintiff D.Y.*** is a thirteen-year-old child who is currently in DCYF foster care custody and is now in his fiftieth foster care placement.  D.Y. has been in DCYF's custody for over four years.  D.Y. has been diagnosed with Post Traumatic Stress Disorder and Unspecified Disruptive, Impulse-Control, and Conduct Disorder, and is viewed by DCYF as having a behavioral health disability.  D.Y. is from King County and is currently residing in Pierce County, in this judicial district.  Pursuant to Federal Rule of Civil Procedure 17(c)(2), he is represented in this action by his Next Friend, Julie Kellogg-Mortensen, who is serving as his public defender.  Ms. Kellogg-Mortensen is sufficiently familiar with the facts of D.Y.'s situation and is dedicated to fairly and adequately representing D.Y.'s interests in this litigation.

13.     ***Plaintiff H.A.*** is a sixteen-year-old youth who is currently in DCYF foster care custody and has been in more than fifteen foster care placements, including three out-of-state

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

placements in Idaho, Tennessee, and Utah, and extended stays in hotels and DCYF offices.  H.A. has been in DCYF's custody for five years.  Over the years, he has been diagnosed by various clinicians with numerous conditions, including Autism Spectrum Disorder, Attention Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder, and Mood Disorder Not Otherwise Specified, and he is viewed by DCYF as having a behavioral health and developmental disability.  H.A. currently resides in Pierce County, in this judicial district. Pursuant to Federal Rule of Civil Procedure 17(c)(2), he is represented in this action by his Next Friend, Kristen Bishopp.  Kristen Bishopp is sufficiently familiar with the facts of H.A.'s situation and is dedicated to fairly and adequately representing H.A.'s interests in this litigation.

14. ***Plaintiff D.S.*** is a sixteen-year-old transgender youth who is currently in DCYF foster care custody and is an enrolled member of the Council of Tlingit and Haida Tribes of Alaska through her biological father.  D.S. has been in DCYF custody for nine months.  D.S. has not had a stable placement since April 2020, and is currently cycling between one-night stays, hotels, and DCYF offices.  D.S. has been diagnosed with Depression and Anxiety, and is viewed by DCF as having a behavioral health disability.  D.S. is from and is currently residing in King County, in this judicial district.  Pursuant to Federal Rule of Civil Procedure 17(c)(2), she is represented in this action by her Next Friend, Tara Urs.  Tara Urs is sufficiently familiar with the facts of D.S.'s situation and is dedicated to fairly and adequately representing D.S.'s interests in this litigation.

15. ***Plaintiff Disability Rights Washington***, a nonprofit corporation duly organized under the laws of the State of Washington, is the statewide protection and advocacy system designated by the Governor of the State of Washington to protect and advocate for the legal and civil rights of those residents of this state who have disabilities, pursuant to the Developmental

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 7

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

Disabilities (DD) Act, 42 U.S.C. §§ 15041-45, the Protection and Advocacy of Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. §§ 10801-51, and WASH. REV. CODE § 71A.10.080(2). DRW is governed by a board of directors comprised predominantly of people with disabilities and their family members.  This board is advised by two advisory councils, the Disability Advisory Council and the statutorily mandated Mental Health Advisory Council, also primarily comprised of people with disabilities and their family members.  DRW's constituents include people with disabilities across Washington, including, but not limited to, Plaintiffs D.Y., A.H., and D.S. and other Washington foster children with behavioral health and developmental disabilities.  DRW provides services statewide, including in this judicial district.

16.    ***Defendant DCYF*** is the state agency whose mandate is to ensure the rights of children to "a safe, stable, and permanent home."  WASH. REV. CODE § 13.34.020 (1998).  This mandate declares that "the family unit is a fundamental resource of American life which should be nurtured."  *Id.*  DCYF is charged with the care and custody of the Named Plaintiffs, putative Class Members, and DRW constituents who have been separated from their families.  DCYF is a public entity that receives federal funding under Title IV-E and Title XIX of the Social Security Act to serve foster children.

17.    ***Defendant Ross Hunter*** is sued in his official capacity as the Secretary of DCYF. Secretary Hunter is responsible for developing and administering or supervising the child welfare program activities, which includes the care and placement of foster children as well as the services delivered to their families.  All alleged acts and omissions by Secretary Hunter and DCYF were taken under color of state law.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

# IV.   CLASS ALLEGATIONS

18.     Named Plaintiffs D.Y., H.A., and D.S. bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) on behalf of themselves and the following similarly situated proposed Class:

> All minors who are now, or in the future will be, in DCYF custody pursuant to Chapter 13.34 of the Revised Code of Washington and who now, or in the future will, have a behavioral health and/or developmental disability.[2]

19.     The class is sufficiently numerous to make joinder of all members impracticable.

20.     According to DCYF data, there are approximately 8,100 children in foster care. Washington's most recent Adoption and Foster Care Statistics ("AFCARS") data indicates that approximately 28% of youth who exited foster care in 2018 had a diagnosed disability.

21.     A 2020 report issued by the Washington State Family and Children's Ombuds ("OFCO") indicated that, in 2020, 220 youth experienced "placement exceptions," meaning that hotels or DCYF offices were used as emergency placements.  STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2020 ANNUAL REPORT (2020), https://ofco.wa.gov/sites/default/files/2020-12/2020%20OFCO%20Annual%20Report.pdf (last accessed Jan. 27, 2021).

22.     Children with behavioral health and developmental disabilities are at heightened risk of experiencing placement exceptions, one-night stays, and congregate care placements.

23.     The questions of fact and law raised by the Named Plaintiffs' claims are common to and typical of members of the Class whom they seek to represent.  Each Named Plaintiff and

---

[2] "Disability," with respect to an individual, means "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1).

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 9

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

putative Class Member relies on Defendants for their safety, health, and well-being, and has

been subjected to significant harms, and/or risks of harm, as a result of the known dangers and

structural deficiencies alleged in this Complaint.

24.     The common questions of fact shared by the Named Plaintiffs and the members of

the Class they seek to represent include, but are not limited to: (1) whether Defendants have a

pattern, custom, policy, and/or practice of failing to ensure Class Members have visitation with

parents and siblings and access to an adequate array of support services and placements

necessary for family reunification or other permanency; (2) whether Defendants have a pattern,

custom, policy, and/or practice of failing to develop case plans that (a) address treatment,

services and supports to assure that children receive safe, stable, and appropriate placements and

safe and proper care while in foster care, (b) facilitate reunification of children with their own

families or with another permanent placement, and (c) ensure educational stability; and

(3) whether Defendants have a pattern, custom, policy, and/or practice of failing to develop an

adequate placement array and instead utilizing inappropriate hotel stays, office stays, one-night

stays, and out-of-state placements, exposing the Class to psychological, emotional, and physical

harm and/or an ongoing immediate risk of such harm.

25.     The common questions of law shared by the Named Plaintiffs and members of the

Class they seek to represent include, but are not limited to: (1) whether Defendants' pattern,

custom, policy, and/or practice of failing to ensure Class Members have visitation with parents

and siblings and access to an adequate array of support services and placements necessary for

family reunification or other permanency subject the Class to continuing deprivation or risk of

deprivation of their rights conferred by the Americans with Disabilities Act, Section 504 of the

Rehabilitation Act, the Adoption Assistance and Child Welfare Act of 1980, and the Fourteenth

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

Amendment to the United States Constitution; (2) whether Defendants' failure to develop case plans that (a) address treatment, services, and supports to assure that children receive safe, stable, and appropriate placements and safe and proper care while in foster care, (b) facilitate reunification of children with their own families or with another permanent placement, and (c) ensure educational stability subjects the Class to continuing deprivation or risk of deprivation of their rights conferred by the Adoption Assistance and Child Welfare Act; and (3) whether Defendants' pattern, custom, policy, and/or practice of failing to develop an adequate placement array resulting in severe placement instability subject the Class to a continuing deprivation or risk of deprivation of their rights conferred by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Adoption Assistance and Child Welfare Act of 1980, and the Fourteenth Amendment to the United States Constitution.

26.     The Named Plaintiffs will fairly and adequately protect the interests of the Class. There are no conflicts of interest between the Named Plaintiffs and other Class Members.  The Named Plaintiffs will vigorously prosecute this action on behalf of the Class.  The Named Plaintiffs are represented by competent counsel with considerable skill and experience in civil rights and class action litigation, who will vigorously prosecute this case on behalf of the Class.

27.     Defendants have acted or refused to act on grounds generally applicable to the entire Class, and their patterns, customs, policies and/or practices harm and/or present an ongoing imminent risk of harm to all members of the Class.  Accordingly, final injunctive and declaratory relief is appropriate for the Class as a whole.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 11

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

## V.    NAMED PLAINTIFF FACTUAL ALLEGATIONS

**Plaintiff D.Y.**

28.     Plaintiff D.Y. was separated from his family in 2016 based upon allegations of abuse.  Having been diagnosed with Post Traumatic Stress Disorder, D.Y. has unique needs that DCYF has failed to meet and indeed has exacerbated.  After taking him from his mother, DCYF placed D.Y. in thirty different foster and group homes located all over the state.  In addition, DCYF has forced D.Y. to stay in a hotel and/or DCYF office on at least twenty separate occasions.  These episodes lasted from one to two nights, to a week, to even almost two consecutive months.

29.     A case note written by a DCYF case manager in April 2018 provides a summary of D.Y.'s life as a foster child in the care of DCYF:

> [D.Y.'s] placement has been unstable since November 2017. He left Ryther following a 30 day discharge notice, then was night-to-night for 3 weeks, then at Helping Hands in Spokane for a month, then following a 30 day discharge notice [D.Y.] went to a [Behavioral Rehabilitation Services] home in Yakima; the placement in Yakima did not last even 30 days.  [D.Y.] is back in night-to-night placements.  He is not currently enrolled in school because the local school cannot meet the needs in his [Individual Education Plan], so [D.Y.] is spending his days at the Kent CPS office.  [D.Y.] needs a stable placement where he can safely spend his days and nights.

30.     In November 2018, D.Y. was placed in a foster home, but he then moved to another foster home in January 2019.  While at this placement, he received in-home behavior services and had visits with his parents every other week.  During one visit with his mother, D.Y. told her, "I don't want to get adopted."  His mother sought a reunification plan, but despite returning one of D.Y.'s siblings to her custody, DCYF refused her request to pursue reunification with D.Y. because it determined she was not capable of meeting his complex behavioral needs.

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

31.     In June of 2019, D.Y.'s foster home gave notice that they could no longer keep him due to his behavioral health symptoms, and his placement ended on July 31, 2019.  Over the next three and a half months, D.Y. again bounced between short hotel stays, one-night foster care stays, and foster placements that would last for only a few weeks at a time.

32.     In November 2019, DCYF placed D.Y. in a BRS congregate care program that had been designated as a Qualified Residential Treatment Program ("QRTP"), based on its own determination that this placement was necessary.  D.Y. sought a less restrictive placement with another sibling, and the dependency court ordered that DCYF was required to make efforts to place the siblings together or to "develop a solid plan regarding how [D.Y.] can be discharged from the QRTP program."

33.     DCYF did not create a plan for reunifying the siblings or discharging D.Y. from the QRTP program, where he remains.  D.Y. continues to be separated from his family while in this program.  In-person family visitations were suspended for several months due to the QRTP's COVID restrictions, and due to scheduling and technical issues, many virtual visits did not take place, or were cut short.

34.     As of July 2020, D.Y.'s permanency plan was still to return home by fall 2020, and D.Y. had no prospects for long-term foster care or adoption.  However, although DCYF had no other plans for providing D.Y. with a stable, long-term home, DCYF filed a petition to terminate both of his parents' rights on May 8, 2020, asserting that termination is in his best interest because he is "adoptable" and "cannot be adopted unless parental rights are terminated."

35.     In January 2021, there was a permanency planning hearing.  The dependency court found, "The Department has not made the efforts to prepare the child for return home or placement with a relative, legal guardian, adoptive parent, or foster family home" because it

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 13

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521  ·  Fax: (206) 957-0729

1    "had not identified what needs to be done to prepare the child for return home or to another less

2    restrictive placement." The Permanency Planning Order confirmed reunification as the primary

3    permanency plan, although DCYF proposed to make adoption D.Y.'s primary permanency plan

4    and has continued to assert that he cannot reunify with his mother due to her inability to manage

5    his exceptional needs. DCYF has not offered or provided any in-home behavioral health

6    services for D.Y. to facilitate a safe return home.

7        36.     Defendants' actions, inactions, policies, patterns, customs, and/or practices have

8    violated and continue to violate D.Y.'s constitutional and federal statutory rights. Defendants

9    have failed to protect D.Y. from harm and a risk of harm by denying visitation, case planning,

10   and support services and placements necessary for family reunification or other permanency and

11   by utilizing inappropriate hotel stays, office stays, one-night stays, short-term placements,

12   and/or out-of-state placements.

13   **Plaintiff H.A.**

14       37.     Plaintiff H.A. was removed from his mother's care in November 2015, when he

15   was eleven years old. Within the first month that he was in DCYF custody, H.A. changed foster

16   care placements three times before being placed for a year in a residential treatment program in

17   Seattle. Upon discharge from the residential program in December 2016, H.A. was placed in a

18   group home for two weeks and then sent to a juvenile detention center. After he was released

19   the next day, DCYF placed him in four separate short-term foster homes over the following nine

20   days. Although DCYF then placed him in another group home, his social worker sought an out-

21   of-state placement for him because there were "not openings" and an "unfortunate amount of

22   declines" for him.

23

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

38.     At a planning meeting on December 14, 2016, H.A.'s mother reported she "would like [H.A.] to come home at some time but they do not have a bond at this time," and expressed concerns that "she would be unable to protect her children and [H.A] at her home at this time." DCYF did not offer or provide in-home services that would help rebuild a parent-child bond or enable H.A.'s mother to safely care for him and his siblings.  Instead, DCYF removed H.A. from the Washington program where he was living and placed him at Mountain Home Academy in Idaho, run by Sequel Youth and Family Services, in January 2017.

39.     Soon after H.A. left Washington, he told his DCYF social worker about a painful restraint incident.  H.A. continued to struggle over the next few months and was reportedly restrained 23 times in the first two months.  He continued to suffer frequent and severe physical restraints, which were often unjustified and abusive.  He reported these to his social worker, who did not investigate his treatment.

40.     While H.A. was in Idaho, the permanency plan continued to be to return home. However, H.A.'s opportunities to visit with his mother and siblings were extremely limited because he was placed out of state.  In March 2018, DCYF held a planning meeting that did not identify any permanency plan, but noted that his behaviors were increasing "due to being anxious [and] wanting out" of the facility.  In April 2018, one of the Washington social workers wrote in a case note about concerns that H.A. was not making progress and observed: "The facility, SEQUEL is located in Idaho and is punitive and leaves little room for a child to be a child."  However, the social worker did not investigate, and Washington kept H.A. in the facility and continued to place other foster children there.

41.     On June 15, 2018, H.A. was transferred to another treatment facility in Tennessee. During his June planning meeting, his team again failed to identify any permanency plan, but

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

did document the placement decision to continue group care at the new facility.  That facility

gave a notice of termination of the placement soon after H.A. was admitted.

42.     In August 2018, DCYF held a meeting with two mental health professionals to

discuss options for H.A. and a potential inpatient admission in one of Washington's long-term

psychiatric facilities for children.  The meeting minutes stated the clinicians' opinions that long-

term inpatient treatment was "not appropriate" and that "the appropriate and proven to be

successful treatment for [H.A.] would be Multisystemic Therapy (MST) at his parental home or

at a foster placement where the focus would be on the family."  In the alternative, the clinicians

indicated their opinions that if H.A. could be placed in a BRS home with a 24-hour case aide

and supervision, MST could also be provided, which they believed would benefit H.A.

43.     H.A.'s mother suggested that H.A. be placed with a particular individual with

whom H.A. had previously been placed, but H.A.'s DCYF social worker rejected her

suggestion, as well as the clinician's suggestion that he be placed in a Washington group home

with MST, because the DCYF social worker determined he needed a more restrictive level of

care.  Over the recommendations of the two mental health clinicians, DCYF refused to place

H.A. in a more integrated setting that the clinical professionals had determined to be more

appropriate, and obtained another out-of-state placement at a facility in Utah.

44.     H.A. was transferred to the treatment facility in Utah in October 2018.  The

November planning meeting again identified no permanency plan for H.A., but documented that

H.A. wanted more visits with his mother and visits with his siblings.  The appointed Guardian

ad Litem recommended that he be placed in a BRS home in Washington because "[b]eing so far

away from family is usually not conducive for reunification."  The Guardian ad Litem further

reasoned that "[e]ven if reunification cannot be achieved, [H.A.] would still appear better served

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521  ·  Fax: (206) 957-0729

if he came to Washington State so he could be closer to family." DCYF ignored these recommendations and continued confining H.A. at the facility in Utah.

45.     While in Utah, H.A. continued to experience painful physical restraints for unjustified reasons. H.A. reported at his April 2019 planning meeting that he would like to go home and was "concerned about the use of restraint in his current facility," but once again, DCYF did not investigate and documented no permanency plan for him. H.A. later reported the restraints to the contracted social worker and to DCYF, who again, failed to investigate his allegations.

46.     In October 2019, at the request of his appointed counsel, H.A. was referred for a Foster Care Assessment Program ("FCAP") evaluation "regarding permanency" and specifically whether he should "move to a less restrictive setting." The evaluator concluded that H.A. had been receiving inadequate treatment at the Utah facility, where he spent "most of his day isolated in his room," and recommended that he be returned to Washington as soon as possible where he should be provided evidence-based treatment to address his depressive symptoms.

47.     DCYF held a planning meeting on January 21, 2020 to discuss H.A.'s court-ordered transition back to Washington. The new placement was discussed, but no permanency plan was identified.

48.     H.A. was placed in a group home in Washington on January 27, 2020, where he stayed for six months. At a planning meeting in April, it was noted that his permanency plan is "long term foster [c]are and [Extended Foster Care]." H.A. ran away from the group home on June 7 and was missing from care until July 2, when a family friend who identified as his fictive kin "uncle" called to report that H.A. had been staying with him. Law enforcement picked H.A. up a few days later and he was placed in a foster home, where he reportedly did very well.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 17

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

However, this was a temporary placement, and the foster parents chose to terminate services on July 31, 2020.

49.     For almost a full month, DCYF provided no other home for H.A., and he lived in DCYF offices with no therapeutic or structured activities.  When she had time, his social worker would take him to appointments or brief outings, but for the most part, he spent his days sleeping or playing video games.  Although H.A. was able to sleep in a hotel for a few nights, he spent most nights at the DCYF office sleeping on a couch.  He continued to live this way until August 26, when he was arrested for allegedly assaulting another teen living in the office with him.  He was released a day later and continued living at the DCYF office until September 11, 2020.

50.     In September 2020, H.A. was placed in a group home in Tacoma pursuant to an Emergent Placement Services Contract.  It took several months for H.A. to get enrolled in school.  Due to lack of transportation, his mother, who lives several hours away, has been unable to consistently visit him.  Although his permanency plan is to return home, as of this filing, he is receiving no services to facilitate reunification with his family.

51.     Defendants' actions, inactions, policies, patterns, customs, and/or practices have violated and continue to violate H.A.'s constitutional and federal statutory rights.  Defendants have failed to protect H.A. from harm and a risk of harm by denying visitation, case planning, and support services and placements necessary for family reunification or other permanency and by utilizing inappropriate hotel stays, office stays, one-night stays, short-term placements, and/or out-of-state placements.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 18

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

**Plaintiff D.S.**

52.    Plaintiff D.S. was adopted in May 2009 by her maternal biological aunt and uncle after her biological parents' rights were terminated.  In 2019, she was sentenced to 455 days in one of DCYF's Juvenile Rehabilitation Centers.  After she finished serving her sentence, her adoptive parents, who had been caring for her since she was an infant, refused to care for her. As D.S. was completing her sentence, one of her "homework" assignments was to "look for people who may be able to let her live in their custody from her local community," but she "did not find anybody that was a viable option."

53.    Upon release from the Juvenile Rehabilitation Center, D.S. was again found dependent due to having no parent capable of meeting her needs, and placed in DCYF custody. Because DCYF had no suitable placement for her, D.S. was released on April 10, 2020, to a temporary youth shelter serving as an "emergency crisis placement."

54.    D.S. had previously been diagnosed with "a mental health diagnosis of Depression with severe psychotic features, generalized anxiety disorder and intermittent explosive disorder" during an inpatient hospitalization for suicidal ideations.  DCYF documented that she disclosed her mental health conditions upon entering its custody and expressed a desire to begin mental health therapy and to continue receiving medication management to address her mental health.  The plan was that she would be referred for mental health services "once there is a stable placement."

55.    The temporary shelter where DCYF placed D.S. turned out to be a nightmare for her.  She was isolated from her family, denied access to mental health therapy, and could not attend school.  As a trans girl, D.S. requested an alternative placement due to the lack of gender-affirming care in the shelter and being bullied by other youth who made her feel scared and

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 19

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521  ·  Fax: (206) 957-0729

1   physically unsafe.  She reported that in addition to not receiving any mental health care, a staff

2   member had stated to her: "You're always going to be a boy. Stop acting like a girl."  Although

3   DCYF acknowledged that this placement was not its preference for D.S., the agency claimed

4   that it had no other options at that time and required that she continue living in this setting.

5        56.    On May 8, 2020, D.S. left the emergency shelter where she was being forced to

6   live, but because the shelter had a COVID-19 outbreak, she had to quarantine at a DCYF office

7   for two days due to her exposure while at the shelter.  With no other placement options, she

8   began living at DCYF offices and hotels.  She slept in hotels at night and spent her days in a

9   DCYF office lobby where other youth with COVID-19 exposure and infection had also been

10   placed.  While living in these conditions, D.S.'s mental health medication was often not

11   available, and she was not provided with the medical and mental health appointments she

12   needed.  DCYF briefly placed her at a BRS facility in Yakima as an emergency short-term stay,

13   but when that placement ended, she resumed living in various DCYF offices and hotels.

14        57.    On June 12, 2020, DCYF held a shared planning meeting to discuss placement.

15   Although D.S. had no parole or conditions of release from the Juvenile Rehabilitation Center,

16   DCYF insisted that she submit to a stringent supervision plan that was highly restrictive for

17   D.S., as well as extremely onerous for any placement resource to implement.  Because the

18   supervision plan was a barrier to D.S. finding a suitable placement, D.S. and her adoptive

19   mother asked that DCYF relax the supervision requirements.  However, DCYF insisted, "it is

20   required, and as her guardians the department has a say in it."

21        58.    Throughout her dependency, D.S. has expressed her desire to be placed in a

22   LGBTQ-supportive family home rather than a group home.  Although her adoptive parents have

23   stated that she cannot return home, D.S. has continued to seek close contact with her mother.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

Without a stable placement close to her family's community, D.S. has been faced with continuous obstacles to maintain this relationship.  DCYF has failed to provide her with stable local and gender-affirming care that she needs to be safe, stay connected with her family, and work towards integrating into another stable and permanent home.  Instead of delivering the care she needs, DCYF searched for group home placements across Washington as well as out of state.  At one point in July 2020, when D.S. resisted DCYF's attempt to place her at an all-boys facility, DCYF forced her to spend the night in a DCYF social worker's car, parked outside one of the DCYF offices.

59.     D.S. still has no stable placement and has made no progress towards permanency. Over the past several months, she has been spending her days in a DCYF office and her nights either in a hotel or a one-night placement that lasts from 7 PM to 7 AM.  On numerous occasions, she has had to sleep at the DCYF office because Defendants did not provide a hotel or one-night placement.  She is not currently participating in school because she does not have access to a computer to enable virtual attendance and she has no other structured activities during the day.

60.     Defendants' actions, inactions, policies, patterns, customs, and/or practices have violated and continue to violate D.S.'s constitutional and federal statutory rights.  Defendants have failed to protect D.S. from harm and a risk of harm by denying visitation, case planning, and support services and placements necessary for family reunification or other permanency and by utilizing inappropriate hotel stays, office stays, one-night stays, short-term placements, and/or out-of-state placements.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

**Plaintiff Disability Rights Washington**

61.     Plaintiff DRW serves as the protection and advocacy system for the State of Washington.  As such, DRW is mandated under the DD and PAIMI Acts to investigate allegations of abuse and neglect, including allegations of inadequate services and failure to implement care or discharge plans.  DRW's federal mandates provide for broad access authority to access records, treatment facilities, and individuals for purposes of monitoring conditions, providing outreach to constituents, and investigating alleged abuse and neglect.  Congress provided this access based on its findings that individuals with developmental disabilities deserve support to "achieve full integration" and that "State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate."  DRW's constituents include the three Named Plaintiffs and other foster children in DCYF custody who have behavioral health and developmental disabilities.

62.     DRW has received and is responsible for investigating complaints about other constituents of DRW who are facing fates similar to those faced by the Named Plaintiffs.  Specifically, DRW has continued to receive credible allegations regarding DCYF's failure to provide DRW constituents with behavioral and developmental disabilities—including, but not limited to, the three Named Plaintiffs—with adequate housing, care, and supports to reunify with their families or otherwise find permanency and stability.  Additionally, DRW has investigated and found evidence of abuse and neglect of foster children with disabilities placed in out-of-state facilities.  For example, after discovering that there were several children placed in Iowa institutions, DRW diverted its limited resources to conduct onsite outreach and monitoring at these facilities.  DRW learned that most of the youth placed in these institutions had no or very limited contact with their Washington social workers and heard allegations from

many of the youth about abusive conditions.  As the designated Protection and Advocacy

system for these children, DRW diverted additional resources to investigate these allegations,

and issued a 2018 report, "Let Us Come Home," about the use of abusive practices at one of the

institutions, Clarinda Academy.  *See* DISABILITY RIGHTS WASHINGTON, WASHINGTON'S OUT-

OF-STATE YOUTH PLEAD: LET US COME HOME (2018),

https://www.disabilityrightswa.org/reports/let-us-come-home/.

63.      DRW continued monitoring out-of-state facilities where DCYF has been placing

foster children with disabilities.  DRW asked DCYF to stop placing youth in facilities owned by

Sequel Youth and Families, the same company that owned Clarinda Academy, after a child died

in the spring of 2020 at the hands of staff restraining him at a Sequel-owned institution in

Michigan.  *See* Tyler Kingkade, *Video shows fatal restraint of Cornelius Frederick, 16, at*

*Michigan foster facility*, NBC NEWS (July 22, 2020, 3:05 PM PDT),

https://www.nbcnews.com/news/us-news/video-shows-fatal-restraint-cornelius-fredericks-16-

michigan-foster-facility-n1233122.  Based on its own monitoring and investigations—as well as

an abundant collection of additional reports by investigative reporters, other Protection and

Advocacy systems, and state licensing agencies—about physical, emotional, and sexual abuse

occurring in other Sequel-owned facilities across the country, DRW diverted its limited

resources to spend several weeks gathering support from other child welfare advocates as well

as the public to join in their demand for DCYF to stop sending foster children needing mental

health treatment to out-of-state Sequel facilities.  In December 2020, DCYF eventually decided

to stop placing youth in Sequel facilities, but it has not stopped placing youth in other out-of-

state institutions.  DCYF claims that this practice may never end for children with "specialized

needs."  Rachel Nielsen, *Washington Misses Its Deadline To Bring Foster Kids Home From*

*Troubled Out-Of-State Group Facilities*, INVESTIGATEWEST (Dec. 3, 2020, 7:20 PM),
https://www.invw.org/2020/12/02/washington-misses-its-deadline-to-bring-foster-kids-home-from-troubled-out-of-state-group-facilities/.

64.     Investigating and addressing complaints and allegations when a child is experiencing placement instability or placed out of state is extremely resource- and time-intensive for DRW staff.  Being able to meet with and privately communicate with constituents is challenging when constituents are frequently moved with little notice, and establishing and maintaining contact with individuals who are in out-of-state facilities is difficult due to distance. Moreover, monitoring out-of-state facilities requires many times more resources than monitoring in-state facilities, which are easier to access due to their location as well as familiarity with DRW's access authority.  In sum, out-of-state and exceptional placements require that DRW divert its limited resources to provide services to constituents in unstable or distant settings and impair DRW's ability to efficiently and effectively serve its constituents subjected to these conditions.

65.     Because DRW's constituency includes the Named Plaintiffs and other foster children with disabilities who are suffering from prolonged separation from their families and communities and inappropriate placements, the interests of DRW and the affected individuals in this case are aligned.  DRW and its constituents have and are being injured by Defendants' conduct.  As such, DRW has direct standing as well as associational standing in this matter under *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977), and *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003).

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

1

2

### VI.   FEDERAL AND STATE CONSTITUTIONAL AND STATUTORY FRAMEWORK

66.   Parents and children have a fundamental liberty interest in being with their families. This "substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The U.S. Constitution protects family relationships as "highly personal relationships" that are owed a "substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (holding that parents and children have a well-elaborated constitutional right to live together without government interference); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual'"); *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (children "enjoy a familial right to be raised and nurtured by their parents") (internal quotation marks omitted); *Beltran v. Cardall*, 222 F. Supp. 3d 476, 482 (E.D. Va. 2016) ("It is beyond dispute that [a mother's] right to the care and custody of her son – and [a son's] reciprocal right to his mother's care . . . is deserving of the greatest solicitude.") (internal quotation marks and citation omitted).

67.   States may only interfere with family relationships when necessary to protect the health, safety, and welfare of children who would otherwise be harmed by their parents' maltreatment. Indeed, in passing the Adoption Assistance and Child Welfare Act of 1980, Congress made "clear that States must make reasonable efforts to prevent the removal of children from their homes … through the provision of home-based services … before removing the child and turning to foster care." 126 Cong. Rec. S14,767 (daily ed. June 13, 1980) (statement of Sen. Cranston); *see also* 42 U.S.C. § 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(b);

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521  ·  Fax: (206) 957-0729

H.R. REP. NO. 96-136, at 6 (1979) ("[N]o child will be placed in foster care, except in emergency situations, either voluntarily or involuntarily, unless services aimed at preventing the need for placement have been provided or refused by the family.").  More recently, Congress passed the Families First Prevention Services Act of 2018 ("FFPSA"), which provides federal funding for child welfare services to "prevent foster care placements through the provision of mental health and substance abuse prevention and treatment services, in-home parent skill-based programs, and kinship navigator services."  Family First Prevention Services Act, Pub. L. No. 115-123, § 50702, 132 Stat. 132 (2018).

68.    When necessary to interfere with children's relationships with their parents, the State assumes a "special relationship" with the children who have been separated from their own families, which imposes a Constitutional duty of care on the State to provide for the children's health, safety, and well-being.  States must exercise professional judgment and refrain from taking actions that fall below professional standards of care or ignoring known or obvious risks of harm.  *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (internal citations omitted); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197-202 (1989).

69.    DCYF is designated as the State child welfare agency responsible for delivering and coordinating services to children and their parents in Washington State.  Under Chapter 13.34 of the Revised Code of Washington, DCYF is authorized to separate families and take custody of "dependent children" who have been abandoned, are being abused or neglected, or are in dangerous circumstances due to having no parent capable of adequately caring for them.  DCYF's overarching purpose is to ensure "children and youth grow up safe and healthy—

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 26

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

thriving physically, emotionally, academically, nurtured by family and community." H.B. 1661, 65th Leg., 3d Spec. Sess. (Wash. 2017).

70.     To achieve this objective, DCYF receives federal funding under Title IV-E and Title XIX of the Social Security Act to provide for foster care, adoption assistance, and supports to kinship guardians, as well as behavioral health services. States that receive federal funding under Title IV-E must ensure that each child in foster care has a written case plan that, among other things, ensures that the child receives safe and appropriate care and placements while in foster care, and that services are provided to the child and their parents to facilitate the child's safe return home. 42 U.S.C. §§ 671(a)(16), 675(1). In addition to family preservation services and remedial services designed to help separated families reunify and remain intact, DCYF also provides residential services for children in foster and kinship care settings and in congregate care settings that are part of its Behavioral Rehabilitation Services program for children with complex physical and emotional conditions that result in high-level needs. DCYF also provides residential and behavioral health services in out-of-state institutions, which are supposed to be used only as a last resort.

71.     Under the recently enacted FFPSA, Congress further amended Title IV-E to include protections against overuse of congregate care settings as well as to promote services to prevent the need for foster care. In order for a congregate care placement to qualify for Title IV-E funding, the provider must be accredited as a QRTP and the placement of each child in a congregate care program must be pursuant to an approved evaluation process. Although the FFPSA requires that the evaluation be completed by a qualified professional who is unaffiliated with the child welfare agency, states may seek a waiver of the "independent" evaluator requirement.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 27

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

72.     Under Title II of the Americans with Disabilities Act ("Title II"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly precludes discrimination against people with disabilities by entities that receive federal funding.  29 U.S.C. § 794.

73.     Under Title II and Section 504, public entities specifically must not provide less effective services to individuals with disabilities or use methods of administration that have "the effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(1)(iii), (3)(ii); *see also* 45 C.F.R. § 84.4(b)(1)(iii), (4).

74.     Title II as well as Section 504 of the Rehabilitation Act further prohibit the unnecessary segregation of individuals with disabilities and require public entities to administer their services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(d); 29 U.S.C. § 794, 45 C.F.R. § 84.4(b)(2).  Public entities may not deliver services in a way that places people with disabilities at risk of unnecessary segregation in settings that limit their interactions with non-disabled peers, family, and members of their community.

75.     If necessary to avoid discrimination on the basis of disability, public entities must make reasonable modifications to their policies, practices, or procedures.  28 C.F.R. § 35.130(b)(7).

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

### VII.   DCYF HAS FAILED TO CORRECT SYSTEMIC DEFICIENCIES AND MAINTAIN A SYSTEM TO MEET THE FAMILY REUNIFICATION AND PLACEMENT NEEDS OF FOSTER CHILDREN WITH BEHAVIORAL HEALTH AND DEVELOPMENTAL DISABILITIES.

**A.   DCYF has failed to ensure children with disabilities receive the necessary child welfare services and supports to allow them to return promptly and safely to their own families and communities.**

76.     DCYF was established in 2017 by 2E2S HB 1661 in order to create "a comprehensive agency dedicated to the safety, development, and well-being of children" which emphasizes "supporting parents to be their children's first and most important teachers."  H.B. 1661, 65th Leg., 2017 3d Spec. Sess. §1 (Wash. 2017), http://lawfilesext.leg.wa.gov/biennium/2017-18/Pdf/Bills/Session%20Laws/House/1661-S2.SL.pdf.  As such, one of the primary objectives of this program is to give children the supports they need in order to be taught, cared for, and nurtured by their own parents. Accordingly, DCYF was mandated to seek and measure outcomes that must include "(A) Increasing family reunification; and (B) increasing the number of youth who are reunified with their family of origin."  *Id.* at § 101.

77.     It is indisputable that separation from family is detrimental to the health and well-being of children.  Children who are separated from their family members lose access to critical social and family supports, including the psychological relief that results from co-regulation and protective support from a trusted caregiver.  In addition, the chronic distress, worry, and anxiety caused by separation from family affects children's ability to engage in typical tasks of development, including learning, and can lead to worse mental health outcomes.  Indeed, the mere prospect of long-term separation and restriction from being with and communicating with family is a cause of stress to children.  According to American Academy of Pediatrics' research, "the psychological distress, anxiety, and depression associated with separation from a parent

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

1    would follow the children well after the immediate period of separation." *Jacinto-Castanon de*

2    *Nolasco v. U.S. Immigration and Customs Enforcement*, 319 F. Supp. 3d 491, 503 (D.D.C.

3    2018); *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1147 (S.D.

4    Cal. 2018).

5        78.    Defendants, charged with the care and custody of vulnerable children, are or

6    should be aware that family separation risks long-term emotional harm to children, and that

7    reasonable efforts to prevent removal and, if removal is necessary, to finalize a permanency plan

8    "have the potential to dramatically reduce unnecessary family separation, decrease child and

9    parent trauma, promote child and parent well-being, and expedite permanency." Jerry Milner &

10   David Kelly, *Reasonable Efforts as Prevention*, AMERICAN BAR ASSOCIATION (Nov. 5, 2018),

11   https://bit.ly/2zsEjo8 (last accessed Jan. 27, 2021).

12       79.    In 2018, the Children's Bureau of the U.S. Children and Families Administration

13   issued a report of its Child and Family Services Review ("CFSR") for the state of Washington

14   to assess performance of Washington's federally funded child welfare programs.

15   ADMINISTRATION FOR CHILDREN AND FAMILIES CHILDREN'S BUREAU, CHILD AND FAMILY

16   SERVICES REVIEWS WASHINGTON FINAL REPORT 2018,

17   https://www.dcyf.wa.gov/sites/default/files/CFSR/WA_CFSR_Final_Report_2018.pdf (last

18   accessed Jan. 27, 2021). The CFSR report found that Washington was not in "substantial

19   conformity" with any of the seven identified outcomes regarding safety, permanency, or well-

20   being. Notably, the report underscored the lack of permanency for many children, stating:

21   "[t]he achievement of timely permanency for children in the state's foster care system is a

22   particular concern. The review found that the agency and court did not consistently make

23   concerted efforts to achieve permanency." In addition to finding frequent failures to make

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30

Disability Rights Washington
315 5ᵗʰ Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

concerted efforts to preserve family relationships, the CFSR found only 17% of the 95 applicable cases reviewed had substantially achieved the outcome of having "permanency and stability in their living situations," in part because DCYF often failed to make "concerted efforts" to achieve "reunification, guardianship, adoption, or other permanent living arrangement," and failed to provide for placement stability.

80.     DCYF has not remediated its failures.  For example, although consistent contact with family is vital to children's mental health and well-being and is an essential component of meaningfully working toward permanency when the goal is family reunification, Defendants still often fail to provide children with disabilities in foster care consistent family visits and calls.  Visits are often suspended due to visitation provider issues, canceled, never scheduled, or made infeasible because of placements across the state or, worse, across the country.

81.     Defendants have also not addressed their failure to support children with behavioral health and developmental disabilities to reunify with their families.  They have failed to establish policies and practices to help families safely reunify, particularly when a child has more intensive support needs.  Defendants have failed to create a system in which case plans meaningfully assure that services are in fact provided to families to improve the conditions in the child's own home and facilitate the return of the child home.  Although DCYF's purpose under WASH. REV. CODE ANN. § 13.34.020 (West 1998) should be to nurture the family unit as a "fundamental resource" for raising children, its policy on "reasonable efforts" to prevent or end out-of-home placements does not define "reasonable efforts" or identify services the social workers must offer families to facilitate prompt reunification or other strategies that would enable families to safely welcome their children with unique or complex needs back home.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521  ·  Fax: (206) 957-0729

82. Defendants have failed to establish policies and practices to engage families in planning supports and placements that will address the unique and individual needs of each child. DCYF policies and practices marginalize family input and preferences for placements, services, and permanency planning. Defendants' failure to establish strategies to include and prioritize family participation in placement planning and decisions is resulting in an overall failure to achieve reunification and permanency.

83. Defendants also fail to establish policies and practices to ensure delivery of services that families need in order to reunify. The DCYF policy regarding Family Preservation Services and Intensive Family Preservation Services has strict eligibility requirements and broad exceptions to when services should be delivered. Defendants' failure to establish policies and practices to provide necessary services for families to reunify is resulting in prolonged and unnecessary family separations.

84. State law further sets forth expectations that foster and kinship caregivers will assist parents "by helping them understand their child's needs and correlating appropriate parenting responses," participate in activities with families, and transport children to family time visits. WASH. REV. CODE § 13.34.260 (2011). However, Defendants have established no policies or practices to train foster parents in how to understand and appropriately respond to children with disabilities and do not have any policies that require foster parents to fulfill their vital role of collaboratively sharing their skills and knowledge with families so that they can raise their own children.

85. Because foster placements are neither trained nor required to provide lasting supports for the children with disabilities and their families, foster children with the highest needs are at risk of being quickly rejected or kicked out by placements that are unprepared and

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 32

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

unwilling to continue serving them and their families.  As a result, Defendants are failing to provide stable, nurturing homes for foster children while out-of-home placement is necessary for their safety.

86.    Defendants are or should be aware of the harm that placement disruptions create. In addition to the emotional trauma of experiencing further abandonment, placement moves often mean disruptions in school and mental health or other therapies, as well as friendships. Yet, according to publicly available data from the Center for Social Sector Analytics and Technology, placement instability has continued to be an ongoing problem that Defendants have failed to solve: in January 2020, 1,795 of the 8,105 children in out-of-home placements (22.2%) had experienced five or more placements.  Center for Social Sector Analytics & Technology, *Children in Out-of-Home Care (Count)* (Oct. 30, 2020), http://www.vis.pocdata.org/graphs/ooh-counts (under filters, click 'advanced'; then click 'number of placement sessions'; then select 'five or more placements'; then click 'update').

87.    According to this same public database, placement instability disproportionately affects Black/African American children, who are already grossly over-represented in the foster care system.[3]  Black/African American children make up 9.35% of children in out of home placements.  *Id.* (under filters, click 'demographics' and select 'Black/African American'; then click 'update').  However, 13.43% of the children who experienced five or more placements are Black/African American.  *Id.* (under filters, click 'advanced'; then click 'number of placement

---

[3] While 4.2 of every 1000 White/Caucasian children are removed from their families, 9.4 of 1000 Black/African American children are in out-of-home placements.  Center for Social Sector Analytics & Technology, *Children in Out-of-Home Care (Rates)* (Oct. 30, 2020), http://www.vis.pocdata.org/graphs/ooh-rates (under filters, click 'demographics' and select Black/African American and White/Caucasian; then click 'update').

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

1   sessions' and select 'five or more placements'; then click update; under filters, click

2   'demographics' and select 'Black/African American'; then click 'update').

3       88.   LGBTQ youth are similarly at risk of suffering extreme placement instability.

4   While in foster care, LGBTQ youth, who are also grossly over-represented,[4] are more likely

5   than their peers to experience harassment, hostility, and even violence due to their identities.

6   Laura Baams, et. al., *LGBTQ Youth in Unstable Housing and Foster Care* 2, Pediatrics (Feb 11,

7   2019), available online at https://www.childrensrights.org/wp-

8   content/uploads/2019/04/2019.02.12-LGBTQ-Youth-in-Unstable-Housing-and-Foster-Care.pdf

9   [hereinafter Baams]; Bianca D.M. Wilson, et al., *Sexual and Gender Minority Youth in Foster*

10  *Care: Assessing Disproportionality and Disparities in Los Angeles* 11-12, The Williams

11  Institute (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/SGM-Youth-in-

12  Foster-Care-Aug-2014.pdf [hereinafter Wilson].  They experience higher levels of placement

13  instability than their peers and are more likely to be placed in congregate care.  Wilson at 41.

14  They are also more likely to have mental health needs than their non-LGBTQ peers in care.

15  Baams at 1.

16      89.   Further, LBGTQ youth have far worse permanency outcomes than their non-

17  LGBTQ peers.  As many as one out of four LGBTQ youth exit foster care without having found

18  a permanent home.  Megan Martin, et. al, *Out of the Shadows: Supporting LGBTQ youth in*

19  *child welfare through cross-system collaboration* 25, Center for the Study of Social Policy (May

20

21  [4] LGBTQ young people are significantly overrepresented in foster care.  While 11.2% of youth not in foster care identify as LBGTQ, 30.4% of youth in foster care identify as LBGTQ.  Laura Baams, et. al., *LGBTQ Youth in Unstable Housing and Foster Care* 1, Pediatrics (Feb 11, 2019), available online at

22  https://www.childrensrights.org/wp-content/uploads/2019/04/2019.02.12-LGBTQ-Youth-in-Unstable-Housing-and-Foster-Care.pdf.  The disparity is also stark for trans youth, who make up 2.25% of youth not in foster care but 5.6% of foster youth.  Bianca D.M. Wilson, et al., *Sexual and Gender Minority Youth in Foster Care: Assessing*

23  *Disproportionality and Disparities in Los Angeles* 7, The Williams Institute (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/SGM-Youth-in-Foster-Care-Aug-2014.pdf.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

2016), https://cssp.org/wp-content/uploads/2018/08/Out-of-the-Shadows-Supporting-LGBTQ-youth-in-child-welfare-through-cross-system-collaboration-web.pdf.  This lack of permanency often leads directly to homelessness for LBGTQ former foster youth.  *Id.* at 10.

**B. DCYF has failed to develop an adequate array of placement options to support the individualized needs of children in foster care with disabilities and instead relies on harmful hotel, office, one-night, and out-of-state placements**.

90.     Defendants' systemic deficiencies further harm the children that DCYF separates from their families.  For example, rather than providing children with stable family-like settings in their communities, DCYF subjects them to dangerous, orphanage-style facilities in remote locations, which may be located in other states such as Utah, Illinois, Florida, Tennessee, and Idaho.  While placed out of state, children typically visit with families only three or four times per year and are often only allowed one phone call per week.

91.     Most if not all of the out-of-state placements require complete segregation from non-disabled peers, requiring that children attend school, receive medical care, and engage in structured activities occurring on-site.  Some of the out-of-state placements have been the subject of allegations including ineffective management, failure to properly train staff, dangerous use of restraints, and physical and sexual abuse and neglect, including incidents where children have died at the hands of staff.  These placements are generally locked or staff-secure facilities, and they are located in remote areas, making it difficult to visit for both state workers and children's family members.

92.     Out-of-state facilities are not subject to Washington State foster care licensing requirements.  When children are placed out of state, DCYF does not directly investigate allegations of abuse or neglect, and instead relies upon the limited information gathered by the facilities and/or licensing agencies in the state where the facilities are located.  DCYF contracts

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 35

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

with social workers in the state where the facilities are located to conduct monthly health and

welfare checks.  Although DCYF began conducting quarterly in-person monitoring in 2018,

DCYF social workers have been unable to visit most out-of-state placements in 2020 due to the

COVID-19 pandemic.

93.     While the number of children placed out of state has decreased over the last year,

the number of instances when children are deprived of an actual placement and must stay

overnight in hotels, referred to as "exceptional stays," has sharply increased.  Since 2014, the

Washington State Office of the Family and Children's Ombuds ("OFCO") has been tracking

"placement exceptions" in which hotels and DCYF offices are used as emergency placements.

In 2016, OFCO began reporting significant concerns about this growing practice, noting the

increase from years past.  In its 2016 Annual Report, OCFO stated:

> "From September 1, 2015 to August 31, 2016, OFCO received notice of 883 placement
> exceptions involving 221 different children.  This is a dramatic increase from the year
> before where OFCO documented 120 placement exceptions involving 72 children.  The
> vast majority of these placement exceptions (870) involved children spending the night in
> hotels/offices.  There were thirteen known instances of children spending the night in
> DCFS offices."

STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2016 ANNUAL REPORT 35

(2017), https://ofco.wa.gov/sites/default/files/2019-09/2015-2016-OFCO-Annual-Report.pdf

(last accessed Jan. 27, 2021).

94.     Every year since, the number of exceptional placements has grown.  OFCO's

2019 Annual Report described interviews with DCYF Regional Administrators ("R.A.s"), who

acknowledged that DCYF was increasingly relying upon hotels and office placements for

children with disabilities whose needs exceeded the supports that DCYF's foster parents were

willing to provide.  STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2019

ANNUAL REPORT (2019), https://ofco.wa.gov/sites/default/files/2020-

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 36

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

01/2019_OFCO_Annual_Report_1-15-2020.pdf (last accessed Jan. 27, 2021).  The report

explained:

> The R.A.s uniformly agreed the problem of placement exceptions is getting worse
> and is not necessarily due to a lack of licensed foster homes.  In fact, R.A.s noted
> many foster homes are empty while children languish in a series of hotel stays.
> They assert that placement exceptions continue because of major changes in the
> population that DCYF serves, -specifically an increase in youth with serious
> mental health concerns, youth involved with the juvenile justice system, and
> youth who suffer from major developmental disabilities. While these new
> populations of children have grown, the recruiting and training of foster homes
> remains tied to a traditional view of a foster child that does not address the
> placement needs for these types of youth.

95.     OFCO also noted other alarming data showing glaring racial disproportionality.

In its 2020 Annual Report, OFCO explained, "Of the children who experienced placement

exceptions, 16.4 percent were Black/African American, while Black/African American children

comprise 13 percent of the out-of-home care population in Regions 4 and 6 and 9.4 percent of

the out-of-home care population statewide."  OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS,

2020 ANNUAL REPORT 19 (2020), https://ofco.wa.gov/sites/default/files/2020-

12/2020%20OFCO%20Annual%20Report.pdf.  It also included data showing that of the

twenty-four children who spent twenty or more nights in placement exceptions, five (20.8%)

were Black/African American, and seven (29%) were Multi-Racial.  *Id.* at 16 fig. 5.

96.     In December 2019, Defendant Ross Hunter admitted to the Seattle Times that

hotel and office placements were "an enormous problem," and that "[r]epeated stays in hotels is

a crazy, bad idea."  Nina Shapiro, *'Crazy bad idea': Top Washington official reacts to

'alarming' rise in children in state care sent to hotels*, SEATTLE TIMES (Dec. 16, 2019),

https://www.seattletimes.com/seattle-news/report-reveals-alarming-increase-in-number-of-

children-in-state-care-sent-to-hotels-its-a-crazy-bad-idea-top-official-agrees.  DCYF R.A.s also

admitted to OFCO that they had concerns about children's safety while in placement exceptions,

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

citing examples of children assaulting one another and engaging in self-harm.  In its 2019

Annual Report, OFCO observed, "Placement exceptions seem to have a dysregulating effect on

all youth, and youth presenting with major mental health issues are particularly at risk."  The

2019 report also described how youth reported feeling that "no one wants them and they are

unlovable."  STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2019 ANNUAL

REPORT at 12-13.

97.    Yet, despite Defendants' understanding that this practice is deeply harmful and

potentially dangerous, the number of placement exceptions continued to increase over the next

year.  In 2020, OFCO issued an Annual Report showing how the number of placement

exceptions had grown to over 1,863 from September 1, 2019 to August 31, 2020, involving 220

different children.  STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2020

ANNUAL REPORT at 14 (2020).  This figure represented a fifteen-fold increase since 2015 and

was the highest number ever recorded.  In almost 300 instances, the location of the placement

exception was a DCYF office.  According to this 2020 report, exceptional placements "can

extend for days, weeks or even months," and the vast majority of the children who experienced

these extended exceptional placements had significant mental health needs.  *Id.* at 23.

98.    The report went on to describe the highly destabilizing conditions that the

children in extended exceptional placements experience:

> DCYF requires that each morning these children leave the hotel or office where
> they spent the previous night, taking all of their belongings with them, with the
> expectation they will not be returning to the same room, or perhaps even the same
> hotel.  Frequently, due to staff shortages and logistics, these children also spend
> their evenings transporting other youth who are out of placement.  Their meals are
> consequently improvised as well, and they frequently eat fast food or food from
> grocery or convenience stores.  They also endure ever shifting arrangements of
> both the other children and the supervising staff that they spend the night with, a
> remarkable lack of continuity for the intimacy of these arrangements.  A variety
> of community members report to OFCO that these young people are inadequately

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 38

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

served in this environment.  The concerns relate to gaps in education, inadequate access to nutritious food, emotional dysregulation, children losing their belongings in transit, and other issues.

99.    OFCO's 2020 Annual Report alluded to another practice of having children sleep in cars, recommending that DCYF "[e]nsure that children do not sleep in cars even when being transported for much of the night."  OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2020 ANNUAL REPORT at 14 (2020).  The director of OFCO previously stated in the media, "We have received reports – not many – but we have received reports of children staying in cars." Elizabeth Amon, *Homeless and in Foster Care: Hundreds of Washington Youth Sleeping in Offices, Hotels, and Even Cars*, THE IMPRINT (Oct. 1, 2020, 7:29 AM), https://imprintnews.org/youth-homelessness/homeless-foster-care-washington-youth-sleeping-offices-hotels-cars/47889.  DCYF also publicly admitted that if a child refuses placement, social workers stay in their cars with the youth until they agree, or "make another plan which may involve going to a hotel."  *Id.*

100.    In its 2020 Annual Report, OFCO further recommended that DCYF institute measures to provide a "humane experience for the youth who continue to experience [exceptional placements], given the intractability of the problem."  STATE OF WASH. OFFICE OF THE FAMILY AND CHILDREN'S OMBUDS, 2020 ANNUAL REPORT at 23.  For example, for children who are experiencing a series of nights in exceptional placements, OFCO suggested that DCYF allow them to stay in the same hotel room instead of making them check out each morning, which OFCO argued would help alleviate children's anxiety about where they will be sleeping each night.  OFCO also recommended other practice changes, such as keeping office kitchens stocked with healthy food so that children would have access to better nutrition and creating spaces in the offices for children to engage in virtual education and other activities.  However,

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 39

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

DCYF has thus far not adopted any policies or provided any guidance to establish these or other practices that might help alleviate some of the daily chaos experienced by youth who are deprived a placement.

101.    This year, Defendants are on track to again break their record for placement exceptions.  The number of exceptional placements has continued to rise dramatically.  DCYF data shows that, between September and November 2020 alone, 591 hotel or office stays have occurred, as compared to 250 placement exceptions during the same time period in 2019.

102.    Foster children with behavioral health and developmental disabilities are also at risk of having to suffer one-night foster care stays.  Like exceptional placements, children provided one-night stays typically must spend all of their waking hours at a DCYF office, where they have limited access to nutritious meals, exercise, education, and other constructive activities.  Only, rather than spending the night at a hotel or at the office, children are dropped off at a foster home late in the evening and picked up in the early morning.  This relentless cycle often repeats for weeks or months.  Although these one-night stays are with licensed homes, these sites often do not even afford children a warm meal, let alone the care, stability, or nurturing that all children need.

103.    Despite the daily harm suffered by children subjected to these practices, Defendants have still failed to develop an appropriate array of services and supports to allow children to live in a stable and nurturing home, either with their families or other caring individuals, in the least restrictive and most integrated setting appropriate to their needs. Instead, Defendants sought new funding for more in-state congregate care facilities as well as long-term hospitalizations, which further segregate children, strain their family units, and do not provide for permanency.

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 40

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

104.    In a December 2020 statement, DCYF indicated that it is also seeking to increase congregate care provider payments and the amount of capacity in congregate care and institutional settings in Washington.  Nothing in Defendants' statement described any changes in policies, practices, or resources to improve the frequency or timeliness of reunifications or provide for long-term and potentially permanent homes.  In January, Defendant Secretary Hunter testified in a legislative committee hearing and presented information about DCYF's increase in congregate care "beds" and plan to add twenty additional BRS-Intensive Mental Health (BRS+) beds by March 1, 2020.  Ross Hunter, Dep't of Child., Youth and Fams., Exceptional Placements (Jan. 19, 2021), https://app.leg.wa.gov/committeeschedules/Home/Document/224692.

105.    Defendants also sought and obtained approval to weaken federal Title IV-E protections against inappropriate use of congregate care in QRTP settings.  Rather than setting up a system for an independent assessment by an unaffiliated evaluator to determine whether these placements are necessary as normally required by Title IV-E, DCYF will continue to use its own social workers' unilateral determinations to place children in congregate care settings. In addition, Defendants continue to maintain that "States retain the right to place youth in group care programs regardless of QRTP status."  Letter from Ross Hunter, Sec'y, DCYF, to Tara Urs (Oct. 30, 2020).

106.    While all foster children who need intensive supports for their behavioral health or developmental disabilities are at increased risk of being placed in segregated foster care facilities, Black/African American children are also disproportionately placed in congregate care.  In January 2020, when 9% of the children in out-of-home placements were Black/African American, 109 of the 950 children placed in group care as their "initial placement setting"

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

(11.4%) were Black/African American. *Children in Out-of-Home Care (Count)* (under filters, click 'advanced'; then click 'initial placement setting' and select 'group'; then click update; under filters, click 'demographics' and select 'Black/African American'; then click 'update'). Similarly, 42 of the 322 children whose longest placement had been group care (13%) were Black/African American. *Id.* (under filters, click 'advanced'; then click 'longest placement setting' and 'select group'; then click update; under filters, click 'demographics' and select 'Black/African American'; then click 'update').

## VIII. CLAIMS FOR RELIEF

**FIRST CLAIM: DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq*.**

107.    Plaintiffs re-allege the paragraphs above.

108.    Named Plaintiffs, putative Class Members, and Plaintiff DRW's constituents are qualified individuals with a disability within the meaning of 42 U.S.C. § 12131(2).

109.    Defendants' agency, DCYF, is a public entity covered under Title II of the Americans with Disabilities Act. 42 U.S.C. § 12131(1).

110.    The foregoing actions and inactions of Defendants have denied Plaintiffs the benefits of Defendants' services, programs, and/or activities and have subjected them to discrimination by reason of their disabilities in violation of Title II of the ADA and its implementing regulations. 42 U.S.C. § 12132.

111.    With respect to Plaintiffs, Defendants utilize "methods of administration" that have "the effect of defeating or substantially impairing accomplishment" of its own objectives to reunify children with their own families or provide them with stable nurturing homes. These methods of administration constitute unlawful discrimination under 28 C.F.R. § 35.130(b)(3).

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

112.     Defendants are engaging in practices that increase Plaintiffs' risk of unnecessary segregation in restrictive placements that isolate them from their families.  These practices violate the "Integration Mandate" and constitute unlawful discrimination under 28 C.F.R. § 35.130(d).

**SECOND CLAIM:  DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794**

113.     Plaintiffs re-allege the paragraphs above.

114.     Named Plaintiffs, putative Class Members, and Plaintiff DRW's constituents are qualified individuals with disabilities under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

115.     Defendants' agency, DCYF, administers a program or activity that receives federal financial assistance.

116.     The foregoing actions and inactions of Defendants have denied Plaintiffs the benefits of, and subjected them to discrimination under, Defendants' program and/or activity solely by reason of their disabilities in violation of Section 504 of the Rehabilitation Act and its implementing regulations.  29 U.S.C. § 794(a).

117.     With respect to Plaintiffs, Defendants utilize "methods of administration" that have "the effect of defeating or substantially impairing accomplishment" of its own objectives to reunify children with their own families or provide them with stable nurturing homes.  These methods of administration constitute unlawful discrimination under 45 C.F.R. § 84.4(b)(4).

118.     Defendants are engaging in practices that increase Plaintiffs' risk of unnecessary segregation in restrictive placements that isolate them from their families.  These practices violate the "Integration Mandate" and constitute unlawful discrimination under 45 C.F.R. § 84.4(b)(2).

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 43

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

**THIRD CLAIM: DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF FOURTEENTH AMENDMENT**
**(Unwarranted Governmental Interference with Family)**

119.    Plaintiffs re-allege the paragraphs above.

120.    Named Plaintiffs, putative Class Members, and Plaintiff DRW's constituents have a right under the Fourteenth Amendment to the United States Constitution to be free of unwarranted governmental interference with the integrity of their families.  This right is part of their constitutionally protected right to privacy.

121.    The foregoing actions and inactions of Defendants have denied Plaintiffs their right to be free of unwarranted governmental interference with the integrity of their families through their ongoing and preventable separations from their families.

**FOURTH CLAIM: DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF FOURTEENTH AMENDMENT**
**(Substantive Due Process)**

122.    Plaintiffs re-allege the paragraphs above.

123.    When the State takes a child into foster care custody, it assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect the child from harm and to keep the child reasonably free from harm and risks of harm.

124.    The foregoing actions and inactions of Defendants constitute a failure to meet their affirmative duty to protect Plaintiffs from harm and keep Plaintiffs reasonably free from harm and risk of harm.  These failures are a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty interests of the Plaintiffs.

125.    Defendants' failures constitute a pattern, custom, policy, and/or practice that are contrary to law and any reasonable professional standards, are substantial departures from accepted professional judgment, and are conducted with deliberate indifference to known harms

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 44

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

and imminent risk of known harms and to Plaintiffs' constitutionally protected rights and liberty interests, such that Defendants were plainly placed on notice and chose to ignore the dangers in a manner that shocks the conscience.

126.    As a result of Defendants' actions and inactions, Plaintiffs have been harmed or are at continuing and imminent risk of harm and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment, including but not limited to the right to be reasonably free from harm while in state custody.

**FIFTH CLAIM: DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE ADOPTION ASSISTANCE AND CHILD WELFARE ACT, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.***

127.    Plaintiffs re-allege the paragraphs above.

128.    The foregoing actions and inactions of the Defendants constitute policies, patterns, practices, and/or customs that violate the statutory rights of the Named Plaintiffs, putative Class Members, and DRW's constituents under the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*, and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357.

129.    These rights include, but are not limited to:

(a) the right to a written case plan that contains, among other things, a plan for assuring that the child receives stable, safe, and appropriate placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A), (B);

(b) the right to a written case plan that assures that the child receives safe and proper care and services that address the child's needs in foster care, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

(c) the right to a written case plan that assures that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home and facilitate return of the child to their own safe home or, if a safe return to the child's own home is not possible, facilitate the permanent placement of the child, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

(d) the right to a written case plan that ensures the educational stability of the child while in foster care, including that the child remains in school and is immediately and appropriately enrolled in a new school when necessary, 42 U.S.C. §§ 671(a)(16), 675(1)(G); and

(e) the right to a case review system that assures that each child has a case plan designed to achieve placement in a safe setting that is the least restrictive, most family-like, and most appropriate setting available and in close proximity to the parents' home, 42 U.S.C. §§ 671(a)(16), 675(5).

## IX.    DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.     Order that this action may be maintained as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

2.     Declare unconstitutional and/or unlawful, pursuant to Rule 57 of the Federal Rules of Civil Procedure:

      a.   Defendants' violation of the rights of Named Plaintiffs, putative Class Members, and DRW's constituents under the Americans with Disabilities Act;

      b.   Defendants' violation of the rights of Named Plaintiffs, putative Class Members, and DRW's constituents under Section 504 of the Rehabilitation Act;

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 46

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

c.  Defendants' violation of the rights of Named Plaintiffs, putative Class
    Members, and DRW's constituents under the Fourteenth Amendment to the
    United States Constitution; and

d.  Defendants' violation of the rights of Named Plaintiffs, putative Class
    Members, and DRW's constituents under the Adoption Assistance and Child
    Welfare Act;

3.     Preliminarily and permanently enjoin Defendants from subjecting Named
Plaintiffs, putative Class Members, and DRW's constituents to practices that violate their rights
and order appropriately tailored remedies directed at Defendants to ensure future compliance
with their obligations to Named Plaintiffs, putative Class Members, and DRW's constituents,
including but not limited to ordering Defendants to:

a.  End the practice of subjecting children to placement exceptions and one-night
    stays;

b.  Establish a process for providing an individualized needs assessment to all
    children subjected to such placements to identify and address barriers to
    placement with their family or other permanency and implement that process,
    including addressing system-induced trauma;

c.  Require that DCYF correct systemic failures resulting in children being
    denied provision of visitation, case planning, and support services, and that
    placements, services, and supports designed to achieve family reunification or
    other permanency are available for children with disabilities;

d.  Require that DCYF correct systemic failures resulting in children in foster
    care not receiving individualized written case plans that actually ensure that

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 47

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

they receive safe, stable, and proper care and placement while in foster care, including any interim placements needed as the child is moved towards reunification or a permanent, family-like setting; services and supports to facilitate reunification with their own families or another permanent placement; and educational stability while in foster care;

e.  Require that DCYF ensure that children with disabilities receive foster care services in the most integrated setting appropriate to the child's needs, including, in accordance with professional standards, with their own families or family foster homes located close to their home communities with supportive services;

f.  Require that DCYF conduct an expert study of (i) deficiencies in DCYF's visitation, planning, and case management, and support services and placements designed to achieve family reunification or other permanency for children with disabilities and (ii) systemic improvements needed to end DCYF's reliance on placement exceptions and one-night stays; and

g.  Require DCYF to correct the deficiencies and implement the strategies identified by the study.

4.  Appoint a neutral expert monitor, paid for by the Defendants, to oversee the relief ordered in the permanent injunction, and order that the Court shall have continuing jurisdiction to oversee compliance with the permanent injunction;

5.  Award to Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and costs; and

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 48

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

6.      Grant such other equitable relief as the Court deems just, necessary, and proper to protect Named Plaintiffs, putative class members, and DRW's constituents from further harm while in Defendants' care and custody.

DATED:  January 28, 2021.

**DISABILITY RIGHTS WASHINGTON**

*/s/ Susan Kas*
Susan Kas, WSBA #36592
315 5th Ave South, Suite 850
Seattle, WA 982014
Tel. (206) 324-1521
Fax (206) 957-0729
Email: susank@dr-wa.org

**CARNEY GILLESPIE PLLP**

*/s/Christopher Carney*
Christopher Carney, WSBA #30325
600 1st Ave, Suite LL08
Seattle, WA  98104
T: (206) 445-0212
F: (206) 238-9987
Email: christopher.carney@carneygillespie.com

**NATIONAL CENTER FOR YOUTH LAW**

*/s/Leecia Welch*
Leecia Welch, WSBA #26590
1212 Broadway, Suite 600
Oakland, CA 94612
Tel. (510) 835-8098
Fax (510) 835-8099
Email: lwelch@youthlaw.org

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 49

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729